Joseph H. MORTON et al., Plaintiffs,

Cordelia E. King et al., Intervening Plaintiffs,

v.

CHARLES COUNTY BOARD OF EDU-CATION et al., Defendants.

Civ. No. 71–64–T.

United States District Court, D. Maryland.

March 6, 1974.

Elliott C. Lichtman, Washington, D. C., John C. Gray, Jr., New York City (Rauh & Silard, Washington, D. C., Mitchell & Mitchell, Baltimore, Md., Jack Greenberg, James M. Nabrit, III, and Norman J. Chachkin, New York City, of counsel), for plaintiffs and intervening plaintiffs.

William L. Marbury, E. Stephen Derby, Judith K. Sykes, Baltimore, Md., and Edward S. Digges, La Plata, Md., for defendants.

THOMSEN, District Judge.

This action was instituted in January 1971 by eight black persons against the Charles County Board of Education (the Board).[1] the persons who were then members of the Board,[2] and the Superintendent (Starkey).[3]

Six of the plaintiffs alleged that they were suing on behalf of themselves and a class of black persons refused employment, refused promotions, demoted or discharged by defendants on grounds of race. They seek damages and injunctive relief under the Thirteenth and Fourteenth Amendments, under 42 U.S.C. §§ 1981, 1982 and 1983, and under Art. 77, § 113[4] of the Annotated Code of Maryland. They claim that the amount in controversy for each plaintiff exceeds $10,000, and invoke jurisdiction under 28 U.S.C. § 1331, as well as §§ 1343(3) and 1343(4).

Two of the plaintiffs are students in the Charles County school system, who, through their parents, alleged that they were suing on behalf of themselves and as representatives of a class consisting of all students attending schools in Charles County who are being deprived of their civil rights because defendants have maintained racially identifiable faculties.

Although counsel had agreed among themselves that determination of the class action issue be delayed until the trial, the court, after extensive discovery, set the matter for hearing on November 9, 1973, and determined on that date that the prerequisites to a class action had not been met.[5]

On November 23, 1973, nine persons moved to intervene as plaintiffs,[6] alleging acts of racial discrimination at

1. The Board had been an appointed board until 1970, when by statute, Acts of 1970, Ch. 386, Art. 77, § 35A, Anno.Code of Md., 1973 Cum. Supp., it became an elected board. The County School Board does not control the amount of its budget. The Board of County Commissioners determines the amount which shall be allowed to the School Board for each school year, usually in June for a year beginning July 1.

2. Six of the defendants took office on December 14, 1970, after their election. No one of them had been a member before that date. A seventh member took office on the day this action was filed, and has not been added as a defendant. Two of the defendants (Cox and Daniel Gardner) resigned, on April 30, 1972, and June 30, 1972, respectively.

3. Starkey became Superintendent on July 1, 1969, having been Assistant Superintendent or Deputy Superintendent since 1965.

4. Art. 77, § 113 provides:
"*Discrimination on account of race, religion, color, national origin, or sex unlawful.*
"It shall be unlawful for the State Superintendent of Schools or any of his assistants, and for any board of education and any superintendent of schools or any of his assistants to make any distinction or discrimination in favor of or against any teacher who may be employed in any of the public schools of this State, on account of race, religion, color, national origin, or sex except where the employment of a certain sex may be reasonably necessary by reason of the nature of the employment, it being the intent and purpose of this section that the provisions thereof shall apply with reference to the appointment, assignment, compensation, promotion, transfer, dismissal, and all other matters pertaining to the employment of teachers in the public schools in the State of Maryland."

5. The court ruled that the requirements of subsection (a)(1) of Rule 23, F.R.Civ.P., had not been met, and that the requirements of (a)(3) and (a)(4) had probably not been met. The evidence at the trial supported this conclusion; the circumstances surrounding the individual claims varied greatly.

6. Counsel for plaintiffs had advised the court and counsel for the defendants on October 1, 1973, that evidence would be presented at the trial concerning alleged acts of discrimination against those individuals.

various times, the first in 1964 and the last in 1973. The running of limitations was tolled during the period from the institution of this case as a class action on January 22, 1971, until this court ruled, on November 9, 1973, that class action treatment was inappropriate. American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L. Ed.2d 713 (1974). Questions of limitations and laches with respect to some of the claims remain.

The case came on for trial on December 10, 1973. Testimony was taken on twelve days; more than 300 exhibits, some quite extensive, were offered. At the conclusion of the plaintiffs' case, the court granted the motion of the individual defendants other than Starkey, for a judgment in their favor in their individual capacity under Rule 41(b), F.R.Civ. P., and granted a similar motion by Starkey with respect to seven of the plaintiffs. Counsel for plaintiffs did not object to these rulings. The case proceeded against Starkey with respect to the claims of the other plaintiffs, and against the Board with respect to the claims of all plaintiffs. Elaborate post-trial briefs have been filed, and oral argument has been heard.

Some facts have been stipulated. The determination of other facts upon which the rights and obligations of the several plaintiffs and the several defendants depend require a consideration of: the history of the Charles County school system over the years; a mass of statistical information;[7] the various records of the individual plaintiffs and of others who were appointed to or considered for the positions in question; and the credibility and weight of the testimony of the many witnesses who testified with respect to general policies as well as to the facts particularly applicable to the incidents in question.

Defendants moved for summary judgment because of plaintiffs' failure to exhaust administrative remedies, but the parties agreed that the motion be argued at trial. Since a full evidentiary hearing has been held, a regard for judicial economy precludes staying decision or dismissing the case on this ground. There is no need to determine whether exhaustion of administrative remedies would otherwise be required, and whether the administrative remedies set out in Art. 77, § 150, Md.Code (1965 Repl. Vol.), and Art. 77, § 150, Md.Code (1969 Repl.Vol.) are adequate remedies. See Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); Humphrey v. Cady, 405 U.S. 504, 517, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); Hayes v. Secretary of Dept. of Public Safety, 455 F.2d 798, 799–801 (4 Cir. 1972); Flaherty v. Conners, 319 F.Supp. 1284, 1287 (D.Mass.1970).

## A. Alleged Pattern of Racial Discrimination

### (1) History

Charles County is a rural county, with many small communities. It is bounded on the north by Prince George's County, a much larger county, adjacent to the District of Columbia. It is bounded on the other three sides by two rural counties, Calvert and St. Mary's, and by the Potomac River. It has only recently received a substantial increase in population as a result of the expansion of the Washington suburbs.

In 1956, one year after the second *Brown* opinion, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (May 31, 1955), the Board adopted a freedom of choice policy for students entering the first grade in the 1956–57 school year. All elementary grades were desegregated on a freedom of choice basis by the 1960–61 year, all middle school grades by the 1961–62 year and all grades, including high school, by the 1962–63 year. For the 1964–65 year the Board eliminated the requirement that requests for transfers be approved, and required all parents to make an affirmative choice, in order to be sure that the right of freedom of choice was understood and exercised

---

7. Without careful study some of the tables might be misleading.

without restriction. That is all that was required by even the subsequent decisions of the Fourth Circuit in 1965 and 1967. Bradley v. School Board of the City of Richmond, Virginia, 345 F.2d 310 (April 7, 1965); Bowman v. County School Board of Charles City County, Virginia, 382 F.2d 326 (June 12, 1967). Exercising that freedom of choice, the parents of 296 black children, out of a total of 4,076, chose to send their children to formerly all white schools during the 1964–65 year; only two white children attended a formerly all black school; and there were only a few black teachers in the formerly all white schools and a few white teachers in the black schools. At that time there were eight predominantly white schools and eight black schools.

The freedom of choice doctrine remained the law of the Fourth Circuit until May 27, 1968, when the Supreme Court decided Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

Meanwhile, in the summer of 1965 (nearly three years before the decision in Green), just after Starkey became Assistant Superintendent, the Board directed the staff to develop a reorganization plan for the complete integration of the system by redistricting according to geographical location, and providing for the necessary new buildings to take care of such integration as well as the increase in population of the County. The plan was adopted by the Board in October, 1965; it was implemented for the high schools for the 1966–67 school year and for the elementary schools for the 1967–68 year.

As in many other school systems, the integration of the schools, followed by the abandonment or merger of some old schools and the building of some new schools due to an increase in the population of the county, created new and difficult problems with respect to teachers and administrators. The population of

Charles County increased 46% (from 32,000 to 47,000) between 1960 and 1970. The increase was predominantly white.[8] The student population increased from 7,410 (of whom 46% were black) in the school year 1960–61, to 16,358 (of whom only 34% were black) in the school year 1973–74.

*(2) Principals and Other Administrators*

The number of black principals has increased from 6 to 8 during the same period, but the number of white principals has increased even more rapidly, so that the percentage of black principals is now 30.7%, whereas it was 37.5% in 1966–67.

The number of black vice principals has increased from 4 to 6, and the percentage of black vice principals has remained about the same, 44.4% to 46%.

This integration has required a considerable readjustment of the staffs of the several schools. Beginning with the high schools in 1966–67, a policy was adopted that when a school was large enough to have a principal and a vice principal, if the principal of the school was white, the vice principal should be black, and vice versa. This policy has been generally followed.

The number of black administrators in the central office has risen from 4 to 10, the percentage from 20% to 22%.

No black teacher, principal, vice principal or administrator has been discharged during the years in question because of his or her race.

Plaintiffs contend that the abandonment of an Administrative Intern Program by defendants was racially motivated, and tends to prove a pattern of racial discrimination. This contention is not supported by the evidence; if any inference to that effect may be drawn from any of the evidence, the court finds that it is overcome by the weight of the evidence to the contrary.

8. In 1960 the ratio of white to black was 66–34; in 1970 it was 71–29. A high percentage of the population in 1970 (44%) was under 18 years of age.

Plaintiffs contend that there has been a pattern of practice of discrimination against blacks in the hiring and promotion of principals and administrators. The evidence does not support this contention. Aside from the case of Mrs. Pinkney, discussed below, the court finds that plaintiffs have not proved that any black person was not appointed principal or administrator because of racial discrimination.

█ The only occasions on which race was a controlling factor in the hiring or promotion of principals or vice principals was to carry out the policy of having a black vice principal where there is a white principal and a white vice principal where there is a black principal. The court finds that this policy at the present time in Charles County does not violate any constitutional right, and is a wise policy.

### (3) Recruiting and Hiring Teachers

The number of teachers has, of course, increased. Almost all of that increase has been in the number of white teachers; the number of black teachers has risen from 198 to 207, but the percentage of black teachers has decreased from 44.2% to 27.4%, for reasons discussed below. In each year at least 17% of the new teachers employed have been black.

No plaintiff contends that he or she was not appointed a teacher because of his or her race. Indeed there is no evidence that any qualified black applicant has been denied employment as a teacher.

Plaintiffs contend, however, that the recruiting policies of the Board and superintendent are racially motivated. To support this argument, they note that the recruiters, most of whom are white, have over the years visited more predominantly white colleges and universities than predominantly black colleges and universities.[9] Since all public colleges and universities and most private institutions are integrated, the fact that a majority of the students attending a particular institution may be white, does not mean that such institution is not the best place to find a qualified black prospect. The Constitution does not require that a school board recruit poor prospects of any race.

The demand throughout the nation for qualified black teachers during the years in question has been great; Charles County offers fewer attractions for black teachers than such communities as the City of Washington and Prince George's County.

It is true that more white persons with low certification have been employed as teachers than black persons with low certification. Almost all persons with low certifications have been hired from the local population just before the school year opened, after efforts to obtain better qualified persons, black or white, had failed to fill the ranks. The small percentage of black persons in Charles County who have a college education, as compared with white persons who have a college education is the reason why relatively few of them have been hired. In the last four years only twelve persons with low certifications or no degree have been hired; of those nine were white and three were black.

Plaintiffs also argue that in the most recent years the average experience of black teachers hired has been greater than that of white teachers, and that this shows a pattern of prejudice. The differences are slight, and the tables plaintiffs refer to show that they are often explained by the hiring of a few

9. The recruiters have regularly visited all of the predominantly black colleges and universities in Maryland and the District of Columbia, as well as the predominantly white public Colleges and universities, which are making serious efforts to obtain black students; over the years they have also visited some black colleges in other states. The number of institutions visited has varied from time to time. Recently only colleges and universities in Maryland and the District of Columbia have been visited, but those visited have large numbers of black students in the field of education.

very experienced teachers from other systems or the return to teaching of a few people who interrupted their teaching for reasons not shown by the evidence and were rehired during the years in question.

The court finds that the policies of defendants with respect to the recruiting and hiring of teachers does not tend to prove a policy of racial discrimination.

### (4) Secretaries and Custodians

Plaintiffs argue that the high percentage of black custodians and the relatively low percentage of black secretaries is evidence of a pattern of racial prejudice. The evidence does not support this contention. The percentage of black secretaries (about 18%), is greater than the percentage of blacks in Charles County with a high school education, despite the greater attractions of a job in the City of Washington or Prince George's County. No testimony was offered with respect to the hiring of custodians.

### B.  Complaints to State Board of Education

Sometime before the summer of 1969 the Charles County Branch of the NAACP received complaints from several persons, in and out of the system, that they had not been appointed to some position for which they had applied or, in the case of two principals, that they had been demoted on account of their race. In June of 1969, before Starkey became Superintendent and before any of the other individual defendants became members of the Board, a disciplinary problem arose with respect to a substantial number of black students at the La Plata Senior High School. The problem was not handled wisely. Some twenty students did not receive their diplomas at the commencement exercises. The parents of those students complained to the NAACP. That organization registered complaints with the State Board of Education on behalf of the several employees and the students.

The State Board appointed a committee of two blacks and two whites to investigate the complaints, to note any deficiencies in the progress of integration, and to make recommendations to the State Board. They were not charged to apply constitutional or statutory standards. The committee interviewed many people and made a report, which the State Board discussed with representatives of the Charles County school system and of the NAACP branch. The State Board then filed a careful opinion, dated July 16, 1970, not purporting to be based on constitutional or statutory principles, adopting some of the recommendations of the investigating committee, modifying some and refusing to adopt others. The opinion also included some good advice to the Charles County Board.

The court finds that a good faith effort to comply with almost all of the recommendations has been made. Any failure to comply with one or more of them does not tend to prove the intention of any defendant to discriminate against black people because of their race.

### C.  H.E.W. Action

In the spring of 1973 the Board, through Starkey, applied to the Federal Department of Health, Education and Welfare (H.E.W.) for funding under the Emergency School Aid Act (ESAA) of a "Basic Project" and a "Special Reading Project". Ted Nixon, a Civil Rights Specialist in the Regional Office of H.E.W., went to Charles County with a letter from the Regional Civil Rights Director to Starkey which called attention to certain provisions of the Regulations, stated that Charles County had had a disproportionate reduction of black principals since the 1964–65 school year, and asked that certain information be submitted within three days. While in the County, Nixon interviewed various persons, and Starkey sent him a letter dated June 7, giving the requested information about twelve persons.

On June 22, 1973, the Regional Office sent Starkey a letter from Walker F. Agnew, the Regional Commissioner,[10] citing ESAA Regulations, 45 CFR § 185.43(b)(2), and § 706(d)(1)(B) of Public Law 92–318,[11] and stating that because of the demotions of Mrs. Elnora Pinkney and James Sweatt from principal to vice principal in 1965–66 and the failure to appoint them as principals in subsequent years, and because during the visits of Nixon to Charles County "the resolution of the problem was not effected", the Charles County application was rejected without a hearing.

Defendants do not question the right of H.E.W. to deny funding if the statute and the regulations are not complied with. Defendants properly note that the language of that statute and of the regulations goes beyond the requirements of the Constitution and the statutes upon which plaintiffs rely in this case. Defendants also argue that some of the conclusory statements in the Agnew letter should not be given much, if any, weight by this court. The court agrees.

### D. Burden of Proof

The evidence does not show a pattern of racial discrimination. See particularly the facts set out above under the headings "Principals and Other Administrators" and "Recruiting and Hiring Teachers".

This case is nothing like Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4 Cir. 1966), North Carolina Teachers Assn. v. Asheboro City Board of Education, 393 F.2d 736 (4 Cir. 1968), or Walston v. County School Board of Nansemond County, 492 F.2d 919 (4 Cir. 1974).[12] In each of those cases a substantial number of black teachers had been discharged when the schools were integrated. In the instant

case there is no claim or evidence that any teacher or principal was discharged because of his or her race. Over the years three black principals have been demoted.[13] One of the three (William Griffis) was an original plaintiff; one (Mrs. Pinkney) intervened as a plaintiff in the fall of 1973; their cases are discussed individually below. The third (James Sweatt) is not a plaintiff and did not testify in this case; he made a statement to the State Board that he did not think he had been discriminated against. In the case of Griffis this court has found that the principal was not demoted on account of his race; in the case of Mrs. Pinkney, the court is granting relief because of failure to appoint her to another principalship. That one instance does not prove a pattern.

The burden of proof remains on each plaintiff to prove his or her case by a preponderance of the evidence. Of course, each plaintiff may rely 'on the testimony of the other plaintiffs and the evidence offered on behalf of all of them, as well as any evidence offered by defendants.

### E. Individual Claims

#### (1) Infant Plaintiffs—Racial Composition of Faculties

Counsel for infant plaintiffs and their parents have presented a table showing the percentage of white and black teachers in each school over a period of years, and argue that this shows racially identifiable faculties throughout the system. Plaintiffs argue that the percentage of black teachers in any school should never be more than 25% more or less than the percentage of black teachers throughout the system.

The law controlling this case is set out in Nesbit v. Statesville City Board of

---

10. But evidently prepared and sent by Nixon, because a copy was sent to Agnew.

11. Codified as 20 U.S.C. § 1605(d)(1)(B).

12. Nor are the facts of this case like those in Chance v. Board of Examiners and Board of Education of the City of New York, 330

F.Supp. 203 (S.D.N.Y., Mansfield, J., 1971), affirmed 458 F.2d 1167 (2 Cir. 1972), or any of the other cases cited and relied on by plaintiffs.

13. Principals have tenure as teachers not as principals.

Education, 418 F.2d 1040 (4 Cir. 1969), as follows:

"All plans must include provisions for the integration of the faculty so that the ratio of Negro and white faculty members of each school shall be approximately the same as the ratio throughout the system. In determining the ratio, exceptions may be made for specialized faculty positions;" 418 F.2d at 1042.

That decision followed closely United States v. Montgomery Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L. Ed.2d 263 (1969), where the Court approved Judge Johnson's order that the board must move toward a goal under which in each school the ratio of white to Negro faculty members is substantially the same as it is throughout the system. 395 U.S. at 232, 236, 89 S.Ct. 1670.

The tables show that Charles County has been moving toward the goal with reasonable speed. The ratio suggested by the attorneys for the plaintiffs has been substantially attained in all but five of the twenty-six schools in the current school year. One of the five is the Vocational Technical Center, which includes many "specialized faculty positions". See 418 F.2d at 1042, quoted above. In three of the other four schools the shifting of one teacher would bring the school into conformance with plaintiffs' suggested test; in one other school the shifting of two teachers would be necessary.[14]

Teachers are not fungible. Some are trained in one subject, some in another. Some have developed special skills for dealing with particular subjects or with students or groups of students having particular problems. The purpose of a school system is to give students the best possible education, including preparation for life in America in the last quarter of the Twentieth Century. This must be done in accordance with constitutional requirements established by the Supreme Court. It is not always, if ever, an easy task. See discussion in Walston v. County School Board of Nansemond County, supra, 492 F.2d at 927.

■ Moving teachers who have lived or taught or both in a particular rural area for years and are familiar with the problems of that area may be not only unkind to the teachers but harmful to the educational progress of the students. Nevertheless, this court is bound by the decisions of the Supreme Court and of the Fourth Circuit to declare that the Board and the Superintendent should take steps to assure that in the schools without specialized faculty positions "the ratio of Negro and white faculty members shall be approximately the same as the ratio throughout the system". 418 F.2d at 1042.

That should be done before the opening of the 1974–75 year.[15] Efforts should be made to change the ratio in the Vocational Technical Center whenever that is practicable.

In view of the progress made by defendants, it would not be appropriate for this court to issue the injunction sought by the two infant plaintiffs.

### (2) Demotions

#### Elnora Pinkney

From 1952–53 through 1965–66 Mrs. Pinkney was an elementary school principal at the Bel Alton Elementary School, which was conducted in the same building as the Bel Alton High School. Both schools had only black pupils during that period. In 1965–66 Mrs. Pinkney was principal of grades 1–6, with

---

14. There are five other schools in which the variance from plaintiffs' suggested test is less than one percent. This is substantial compliance.

15. The court recognizes the difficulties which exist because of the small number of teachers in some of the schools and the fact that a single retirement, death or illness before or during a particular school year may create an imbalance. Nevertheless, the Board and staff should make every reasonable effort to meet the required test.

275 students, and James Sweatt, also black, was principal of grades 7–12.

As a result of the plan of integration, Bel Alton became a consolidated school, with one principal and a vice principal. Grades 1–5 and 9 were the only grades at Bel Alton during the year 1966–67. Of the 602 students in the school that year, 405, of whom 216 were white, were in grade 9. Bel Alton was classified by the State Department of Education as a high school, and its principal had to hold a certificate as a secondary school principal. Mrs. Pinkney did not have such a certificate. James Campbell, a white man, who had such a certificate, became principal of the consolidated school. Mrs. Pinkney became vice principal, in accordance with the general policy of having the vice principal black when the principal was white, and vice versa.

As vice principal in 1966–67 Mrs. Pinkney went onto the vice principal scale. Although her salary as vice principal in 1966–67 was about the same as her salary as principal in 1965–66, she made less than she would have made as a principal, depending upon the size of the school.

Starkey knew that Mrs. Pinkney wanted to be a principal, and told her when she was appointed vice principal of Bel Alton in the summer of 1966 that he hoped she would take the position until something better came along. Mrs. Pinkney served as vice principal at Bel Alton for three years, ending in 1968–69.

Four principals for elementary schools were appointed or shifted for the year 1969–70, because of the opening of a new school, the Gale-Bailey School. Mrs. Pinkney filed a timely application for appointment as a principal for the year 1969–70.

The principalship of Gale-Bailey, a school with 463 students, was filled by the transfer of Dale Arbogast (white) from Indian Head, 738 students. The principalship of Indian Head was filled by the transfer of Fred Berry (white) from Dr. Mudd, 564 students. The principalship at Dr. Mudd was filled by the transfer of a white woman from Waldorf, 320 students.

The principalship at Waldorf was filled by the appointment of a white woman, who had only a provisional certificate. None of the four persons appointed or shifted had greater qualifications than Mrs. Pinkney, whom the court finds to have been a thoroughly competent principal.

Shortly thereafter Mrs. Pinkney applied for and was appointed to the position of pupil personnel worker in the central office. She was offered the principalship of a very small school in 1973, when she was 65 or 66 years of age, but she naturally preferred to remain as pupil personnel worker, for which she had taken additional courses.[16]

■ The court finds that it was not unreasonable or discriminatory to appoint Campbell to be principal of the combined Bel Alton school in 1966, nor to appoint Mrs. Pinkney vice principal of that school. Moreover, limitations had run on acts in 1966 before this suit was filed.

But no adequate justification has been shown for passing over Mrs. Pinkney in favor of a white person in the four appointments of elementary school principals in the summer of 1969. The court does not depart from its finding, set out above, that there was no pattern of prejudice in the Charles County school system during the years in question. But the court does find that race was a factor in denying Mrs. Pinkney appointment as a principal before and during the year 1969–70, when a less qualified white woman and three other persons were appointed to elementary school principalships for which Mrs. Pinkney had applied.[17]

16. The small size of the school would have meant a relatively low salary.

17. The court does not accept defendants' argument that Mrs. Pinkney was too old for the job.

The court concludes that Mrs. Pinkney should have been appointed principal of the Indian Head School for the year 1969–70 and subsequent years. The salary she would have received and would continue to receive in that position is substantially greater than the salary she has received and presumably will receive in her present position. Counsel should agree upon the figures to be included in the judgment.[18]

Plaintiff has asserted a bona fide claim of more than $10,000, and this court has jurisdiction to grant relief to her.

### William L. Griffis

Griffis came to the Charles County system in 1951 as principal of a two teacher elementary school; in 1954 he became principal of a six teacher elementary school; in 1961 he became principal of the Mt. Hope Elementary School, an eleven teacher school. That school became integrated for the school year 1967–68. Whereas in 1966–67 there had been 268 pupils, all black, in 1967–68 there were 293 pupils, 188 black, 105 white.

Griffis is a fine, sympathetic person, interested in people and anxious to help them. He is really too sympathetic to be a fully effective administrator.[19] For several years before 1967–68 there had been some justified and some unjustified complaints about his effectiveness as a principal. In October 1967 Griffis met with Jenkins, Starkey and the chief personnel officer of the system, and the areas of ineffectiveness were discussed. In the spring of 1968 two of the supervisors were critical of his performance.

When it was rumored that Griffis would be transferred to another position the teachers at the school supported him; the parents of the students were divided. At the end of the year 1967–68, Jenkins transferred Griffis to the position of Administrative Assistant at the Indian Head School, a large school with 666 white, 478 black and 7 "other" students, and appointed a black man from outside the system to be principal of the Mt. Hope School.[20]

Griffis protested his demotion to the National Education Association, but the local organization of the NEA could not conduct an investigation because Griffis did not consent to the opening of his confidential files. He also refused to allow his file to be shown to a group of parents who protested his removal as principal at Mt. Hope.

Griffis was at Indian Head for two years. Thereafter, he has been assigned to various positions in various schools.

Beginning in February 1969 Griffis submitted four applications to be principal of an elementary school, but failed of appointment in each case. Griffis also applied for the position of Pupil Personnel Worker which Mrs. Pinkney, another plaintiff herein, received.

During the two years Griffis was Administrative Assistant at the Indian Head Elementary School, he was criticized for spending too much time on routine matters and not enough time on major responsibilities, and because he did not show initiative in the area of instruction. Each of the two principals under whom he served stated that they could not recommend Griffis for appointment to the principalship of an elementary school.

Six of the thirteen elementary principals appointed between 1969–70 and 1973–74 have been black.

Anyone without a stone heart must be sympathetic with Griffis. This court cannot find, however, that his demotion from principal of the Mt. Hope school to

---

18. Including any effect on retirement benefits.

19. E. g., he had not submitted an unsatisfactory report on a teacher over many years.

20. Only teachers have tenure; principals and vice principals have tenure only as teachers.

The salary Griffis received as Administrative Assistant at Indian Head was $12,073.43, more than he had received during the past year, but less than he would have received ($12,726.80) if he had continued as principal at Mt. Hope.

his position at the Indian Head School and the subsequent refusals to appoint him as principal of another school were not made in a good faith effort to improve the quality of the administration of the schools and to find the spot where Griffis' personality and abilities could be used to best advantage. The decisions were not made on the basis of race, or because of any racial prejudice.

### (3) Failure to Promote

#### Joseph A. Jones

Dr. Jones, an intervening plaintiff, who was a teacher of health and physical education in Charles County in 1964–65 and is now on the faculty at Coppin State College, asserts no claim for damages and does not seek reinstatement or appointment to any position. It is not clear what relief, if any, he seeks, except to join in the claim for a broad injunction. He testified that sometime prior to the 1965–66 school year, he applied for the position of Supervisor of Physical Education for that year. No one was appointed until two years later. There is no record of his application for that position, and the evidence shows that he applied for a position on the Coppin faculty in April 1965 and was appointed. Jones contends that the Charles County position would have been given to a white man if he had not applied and protested the proposed appointment. The evidence does not justify any such finding, and, in any event, the claim is barred by limitations and laches.

His second claim is also barred by limitations and laches. He testified that he made application in 1965 for a position as vice principal after a notice of vacancies showing that four such positions would be open. He contends that he was only considered for one of those positions—in a black school. This is not improbable, because the system was in the early stages of desegregation and integration, see "History", above, but Jones delayed filing suit for so long that neither he nor defendants have any record of his application, if indeed it was made. There is a form, filled out by Jones, indicating both that he wished the same assignment that he had and that he did not expect to continue teaching in Charles County. The correspondence with respect to his resignation was produced by defendants, and does not support Jones' testimony.

#### Raymond F. Sanderlin

Between May 1971 and January 1973, Sanderlin filed seven applications for various positions in the Charles County system. One of the applications was successful. He claims that the rejections of his six other applications were motivated by racial considerations. The court finds that in none of the rejections did racial discrimination play any role.

Sanderlin's academic background and work experience were in the field of special education. He was a special education teacher from 1966 to 1971. He earned a master's in special education in June 1972; all of the courses which he took to earn that degree were in that field.

In May 1971 Sanderlin's application for admission to the Administrative Intern Program was rejected. Eight blacks had applied for admission to that program and twenty-one whites; four blacks and six whites were accepted. All candidates for the positions were required to take the Miller Analogy Test, on which Sanderlin scored very poorly.

The Miller Analogy Test is a recognized test used by many graduate schools in determining which applicants should be admitted. The use of that test in screening applicants for admission to the Administrative Intern Program is quite different from the use of the NTE Test condemned in Walston v. County School Board of Nansemond County, 492 F.2d 919 (4 Cir. 1974), where (1) the NTE Test was used to determine which experienced teachers should be discharged, (2) the developers of the test stated that it was "least valid when applied to experienced teachers",

and (3) where the use of the test as the sole criterion resulted in the discharge of fifteen black teachers and only two white teachers. There was no such disproportionate result from the use of the Miller Analogy Test as one of the factors for admission into the Administrative Intern Program. Nor was use of the Miller Analogy Test subject to the criticisms of the tests which were discussed in *Chance*, supra. 330 F.Supp. at 209 et seq., 458 F.2d at 1170 et seq., 1174 et seq.

In October 1971, Sanderlin unsuccessfully applied for a position as a transportation specialist,[21] a position which encompassed responsibilities such as setting up bus routes, assessing transportation needs, and compiling mileage records. Sanderlin had no background in that area. Two persons were chosen for the positions: Otto Williams (black) and Charles Wineland (white). Wineland had been certified in transportation by the State Department of Education; Sanderlin had not; it is not clear whether or not Williams had been certified.

In November 1971, Sanderlin applied for the position of "learning disabilities teacher", a position for which he was qualified. He received that position.

In November 1971, Sanderlin again applied for admission to the Administrative Intern Program. He was screened by a committee of six people in February; he was recommended by three, while the other three recommended him with reservations. He was appointed to the program by a letter dated March 3, 1972, but claims that he never received the letter. Whether or not Sanderlin received the letter became unimportant when the funding for the program was cut off before Sanderlin would have entered the program.

In May 1972, Sanderlin unsuccessfully applied for the position of principal. He did not then meet the minimum requirements for certification to be a principal, because he lacked the required courses in administration and supervision, as well as particular courses which are required depending upon whether certification is sought as an elementary or a secondary school principal.

Sanderlin unsuccessfully applied for the position of "Supervisor of Special Education" in the summer of 1972. He and two other candidates were screened, but the screening committee recommended a white candidate who not only had the formal preparation which Sanderlin had, but also had had administrative experience in Prince George's County. On the screening committee was James Sweatt, a black man, who was then Supervisor of Special Education and would have been familiar with Sanderlin's performance as a teacher over several years.

In January 1973, Sanderlin applied to be a diagnostic prescriptive resource teacher. The position was not funded, so no one was chosen.

The court finds that racial discrimination played no part in the rejection of any of Sanderlin's applications.

### Cordelia King

Mrs. King claims that she was refused appointment as a principal or vice principal on several occasions because of her race.

After 20 years as a guidance counselor, Mrs. King applied in May 1971 for admission into the Administrative Intern Program, which was designed to develop principals, vice principals and other administrators. At the same time she applied for whatever positions as principal or vice principal might be

21. Sanderlin claims not to have received any response to some of his applications. The Board did not have a large enough clerical staff to reply individually to each of the many applications received for all sorts of positions. Notice of the availability and notice of the filling of each position were posted on school bulletin boards; thus every staff member who checked the boards could learn of the status of any application he had submitted.

open. She was accepted for admission into the Administrative Intern Program, but refused the opportunity because she learned that she could not be in that program and at the same time be a principal or a vice principal, and she hoped to be appointed to such a position at that time.

Mrs. King overlooked the fact that she needed 34 more semester hours to meet the minimum requirements set by the State Board for certification to be a principal, and the evidence shows that she was not eager to take such courses. When, during the previous autumn, her certificate to be a guidance counselor was in danger of not being renewed because she had not kept it green by taking six credit hours in her field in ten years, she asked Starkey to exercise his option to waive the requirement, and he did so. She wrote him a letter of appreciation in January 1971, in which she said: "Aside from saving many dollars, time and effort for me, it gave me peace of mind to return fully to the business at hand—counseling students. This is my calling and one which I love dearly".[22]

She was not appointed a principal or vice principal in 1971 or in the two subsequent years. It is interesting to note that some of the people in the Intern Program have been appointed.

Although both sides have argued many points, including the general policy of having a white vice principal when there is a black principal, and vice versa, the court finds that the reason Mrs. King was not appointed to the positions she sought was her lack of certification for a position as principal and her lack of willingness to do the work necessary to obtain it.[23] There was no racial prejudice or discrimination involved.

### Kenneth Wright

Wright was employed by the Board as a general maintenance worker at the G–2

(semi-skilled) level from July 1967 until July 1973, when he resigned to take a higher paying position with another employer.

His first claim arises from the hiring of a white man, Samuel Oliver, in November 1971, at the G–3 (skilled) level, with higher pay than Wright and with supervisory status over him. Oliver had special qualifications to be hired at the G–3 level; he had experience in carpentry, masonry, grading, painting and paperhanging. Wright's experience was less than Oliver's, and it was believed that Wright would benefit by working under him. No racial factor motivated the hiring of Oliver at the G–3 level, with supervisory status over Wright.

Wright's second claim stems from the promotion of George Scott, a white man, to the only G–3 opening available for the 1972–73 school year, rather than Wright. Both the Director of School Facilities for the Board, and the foreman of the Maintenance Department believed in good faith that Scott's talents were superior to Wright's at that time. Their evaluations were of the sort that supervisors often have to make. Their judgments were not influenced by any racial factor. A year later, in the summer of 1973, Wright was offered a promotion to the G–3 level, which he declined, because he was about to resign to take a position with another employer.[24]

### (4) Terminations

#### Annie C. Yates

Mrs. Yates was employed by the Board as a cafeteria manager from 1963 to 1968.

In June 1968, Mrs. Margaret Posey, Supervisor of the School Lunch Program, sent a memorandum to all principals enclosing job specifications for cafeteria manager and stating: "All managers for 1968–69 will be expected to as-

---

22. Mrs. King is obviously an able and forceful guidance counselor.

23. Defendants have reasonably believed that a person should not be appointed a vice principal unless he or she was prepared to advance to principal; they do not want a vice principalship to be a terminal job.

24. This offer was made before Wright intervened in this case.

sume the full responsibilities listed". Theretofore some of those duties had often been performed by principals, school secretaries, teachers and students. Without objection from her principal, Mrs. Yates had arranged for one of her assistants to perform a part of her duties.

In July 1968, Mrs. Posey conferred with Mrs. Yates and her principal. Mrs. Yates was told of the new policy, and testified that she got the impression that her principal thought she was not qualified for the job, because it would entail more paper work than she could handle. Mrs. Posey told Mrs. Yates that if she felt that she couldn't handle the responsibilities of the position as manager, she was assured of a position as a fulltime cook. Mrs. Yates thereupon submitted her resignation.

A white woman was promoted to cafeteria manager for the school for the year 1968–69, and another for the year 1969–70. In the summer of 1970, a black woman was appointed and served until November 1970, when Mrs. Yates' daughter was appointed and has held the position ever since.

The preparation of the job description was a good faith effort to upgrade the position of cafeteria manager throughout the system; the conference with Mrs. Yates was a legitimate attempt to assure that she knew her responsibilities and was willing to carry them out. There was no racial discrimination.

### Milbourne Hull

After seven years as a teacher of vocational agriculture, and 23 years as an Assistant Professor of Agriculture with the Extension Service of the University of Maryland from 1944–1967, Hull was employed by the Board as Assistant in Federal Programs for the school years 1967–68 and 1968–69. His salary of about $14,000 was funded principally by the Federal Government, the rest by the Maryland State Department of Education and Charles County.

The arrangement did not work out well. Starkey felt that Hull was a good liaison man with the Federal Government, but that he was not a good administrator. During the year 1968–69 some of his responsibilities were assigned to others.

In February 1969 Starkey advised Hull that the proposed budget for 1969–70 eliminated the position Hull held, but that it provided for a joint program with St. Mary's and Calvert Counties. Starkey said that he would keep Hull advised so that he could apply for the tri-county position if he was interested.

The tri-county program did not materialize, not through any fault on the part of Charles County, and the Charles County budget for 1969–70 as finally passed eliminated the position of Assistant in Federal Programs. The position was reinstated in the budget for the following year and filled by another black man.

On May 17, 1969, Hull asked to be appointed Assistant Superintendent or Coordinator of Federal Programs or Coordinator of Recruitment of Personnel, positions which did not exist.

On June 27, 1969, Starkey informed Hull that the funds for the tri-county program for federal programs had been eliminated from the budgets of all three counties and reminded him that no funds had been provided for the position of Assistant in Federal Programs. He informed Hull that his contract terminated June 30, 1969, but that defendants could provide Hull with work for about ten days. He suggested that Hull contact Leviner, the Director of Personnel, about teaching positions which might be available.

Hull was screened for the position of administrative assistant to the superintendent on July 3, 1969, along with three others. The Screening Committee recommended John Bloom for the position. Hull was also recommended with the observation that he lacked school adminis-

trative experience. The position was not filled.[25]

He was given an opportunity to apply for a position as teacher or vice principal, but told Starkey that he was not interested in teaching and would accept a vice principal position only with the understanding that he could resign upon fifteen days' notice.

Hull secured the services of an attorney, James Mitchell, who by letter of July 30, 1969, requested that the Board employ Hull during August 1969, in order to enable him to seek another job. Hull was given a position from August 7 to August 31. He obtained employment with H.E.W. in Charlottesville late in 1969, and later at Temple University, at salaries lower than his Charles County salary.

Hull had no tenure and knew it. The termination of the position he held in 1968–69 was not due to his race. Starkey was willing to give him certain jobs, but not those which Hull unrealistically asked for.

### (5) Failure or Refusal to Hire

#### Mrs. Bertha W. Key

Mrs. Key makes two claims of discrimination. In her first claim, she alleges that she applied for the position of Reading Coordinator in Charles County in 1963–64, but was denied the position on the basis of her race. Mrs. Key first asserted that claim in November 1973 when she intervened in this case, almost ten years after any such claim accrued. Her first claim is barred by the statute of limitations.[26]

Mrs. Key's second claim stems from her application for the position of Administrative Assistant to the Superintendent in August 1969. Mrs. Key applied for the position, and was screened for it. At her screening session, several of the interviewers expressed an interest in hiring Mrs. Key for the position of administrative assistant to a principal, but Mrs. Key was only interested in the position of Administrative Assistant to the Superintendent. Because of severe budget cuts, that position was not funded or filled.[27]

She was not discriminated against on the basis of race.

#### Sandra Washington Hearns and Lacey Tillotson

In late May 1968, Mrs. Hearns, Miss Tillotson and another black woman came to Charles County to interview for two summer positions in social work, one with a Title I program, and one with Head Start. Two of the three now claim that they were discriminated against on the basis of race. The two jobs were awarded to two white women, who had the necessary qualifications, but all of the records, except those of the two women who were hired, were lost or destroyed before Mrs. Hearns and Miss Tillotson asserted any claim of discrimination. The first knowledge any of the defendants had of such a claim was October 1, 1973. Although Mrs. Hearns and Miss Tillotson intervened as plaintiffs in November 1973, they did not testify either in person or by deposition, and the evidence offered in support of their claims is sketchy, at best.

Plaintiff Hull testified that he interviewed both women; that they were well qualified for the jobs; that immediately after he interviewed them, he was called to Superintendent Jenkins' office and was told that a white applicant for one of the positions had to have an immediate answer, and asked Hull's advice. Hull did not object to her appointment

---

25. Later, other persons, white and black, applied for the position, including Mrs. Bertha Key, but the position was not filled during that school year.

26. The statute of limitations was tolled on this claim from January 22, 1971, until November 1973. See Class Action discussion, above.

The claim was already barred when this action was filed.

27. If the position had been filled, it is doubtful that Mrs. King would have been appointed; each of the five persons who interviewed her, including two blacks, recommended her for the position with reservations.

and did not inform Jenkins or Starkey, who was also present, that he had just interviewed three well qualified black applicants; there is no evidence that Jenkins or Starkey ever heard of them.

Although the two social workers who were hired were white, most of the staff in the combined programs was black. It seems that there would be some advantage in having a black social worker, but the evidence in the case does not justify a finding that they were not appointed because of racial discrimination.

### Jerome Thompson

In February 1969 the Board and staff were looking for a Director of Purchasing. Thompson, who had worked for the system as an accountant for two months before going into military service several years before, and who had done accounting work in the service, learned of the opening, and applied for the position of Assistant in Purchasing.[28] He did not have a master's degree, which is a prerequisite to certification as director; indeed he did not have even a bachelor's degree, which is required for an Assistant in Purchasing, and he has not yet obtained his bachelor's. He was screened on March 3, 1969, along with several others, and John Gee, an experienced principal with a master's degree, who had also applied, was chosen on March 7, to assume the position on July 1. Meanwhile, on March 6, Thompson had applied for and obtained a job with the AAA, and started work on March 7. There was no racial prejudice involved.[29]

### Joseph H. Morton

The Board opened its first Vocational Technical Center at high school level in September 1969, and during the 1968–69 school year sought a director for the center, a position equivalent to that of a high school principal. The policy of the Board was to require a master's degree for appointment as principal; a master's is a requirement for certification as a principal by the State Board of Education.[30] Two qualified persons had applied for the position but had withdrawn their applications, and Jenkins and Starkey (then Deputy Superintendent) hoped that the Board would modify the requirement. A staff member got in touch with Morton, who was then an instructor in industrial arts in Prince George's County, having previously taught in Charles County and having had work experience. Morton had a bachelor's degree in industrial arts and had taken some graduate courses.

Morton never filed a formal application for the position of director of the new center. He did speak to Starkey, and met with Jenkins and Starkey on March 26, 1969. They told him that the Board would have to decide whether or not it would waive the master's requirement. Jenkins and Starkey took the matter up with the Board, but since three of the five members were retiring in May, the Board decided that the choice of a director should be made after the new members had taken office.

Morton had an offer of a position in another system as to which he had to

28. The titles of Director of Purchasing and Assistant in Purchasing describe similar positions, which are labeled differently depending upon the degree which the person who holds the position has. A person with a master's would be a Director of Purchasing; one with only a bachelor's would be an Assistant in Purchasing.

29. Plaintiffs claim that Gee was shifted to the position of Director of Purchasing because he was a poor principal. It is more likely that Gee was not happy in his principalship and

therefore applied for the job, for which he was qualified and Thompson was not.

30. This policy was regularly followed by the County Board at the secondary level; the only two exceptions have been one black man as principal who was within six months of obtaining his master's and one black man as acting principal for the remainder of a school year. There have been some exceptions at the elementary level, but one black and one white principal without master's degrees have been demoted, and all prinicipals now have master's degrees.

make a decision promptly. Accordingly, he talked to Starkey on the phone four or five times, and withdrew his application in early May, before the new board members met. He took the other job and does not claim that he has lost any money as a result of not obtaining the directorship.

The Board stuck to its requirement of a master's degree, and appointed a white man with a master's and who was certified in administration, but had no experience in vocational education.

Morton testified that he felt he had been "given a run around". The court does not find that to be a fact, and finds that he was not denied employment as director for any racial reason.

### Veronica Adams

Miss Adams completed the commercial course at a high school in Prince George's County and graduated with honors in June 1969. She lived in that county with an aunt, who persuaded her to apply for a position with the Charles County Board in August 1969. She was interviewed by Douglas Kincaid, who had just assumed the position of Director of Personnel. She filled out an application in which she wrote an incorrect telephone number. Kincaid obtained her school records, and attempted to reach her on the telephone three or four times to come in for a typing test. It was the policy at that time to make such appointments by telephone and to write to the applicant only if she had not given a phone number where she could be reached.

Miss Adams made no effort to follow up her application (except possibly for one phone call, of which neither she nor defendants have any record). She made no effort to get any other job for at least a month; she testified that she cannot remember where she tried to get a job, but was employed by a Washington concern in December 1969. She worked at that job for two and a half years. She did not make or file any complaint or grievance to or with the State Board or the County Board or any member thereof.

Charles County then had about 17 black secretaries out of a total of about 76. There is no evidence that any other black applicant for a position as secretary was ever turned down. Defendants would like to hire more black secretaries, but the competition from Prince George's County and the many offices in Washington make this very difficult.

Miss Adams was not denied employment by the Board for any racial reason.

### Conclusion

Counsel should prepare a judgment order embodying (1) a declaratory judgment with respect to the racial composition of faculties, (2) a judgment in favor of Elnora Pinkney, and (3) a judgment denying all other claims, in accordance with the opinion. The judgment should also contain an award of counsel fees in accordance with a supplemental opinion which will be promptly filed.

### SUPPLEMENTARY OPINION

#### Attorneys' Fees

Section 1617 of Title 20, U.S.C., which became effective July 1, 1972, provides:

"Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this chapter or for discrimination on the basis of race, color, or national origin, in violation of Title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Cases discussing that section include Northcross v. Board of Education of Memphis, 412 U.S. 427, 93 S.Ct. 2201, 37

L.Ed.2d 48 (1973); Medley v. School Board of the City of Danville, Va., 482 F.2d 1061 (4 Cir. 1973), cert. den. 414 U.S. 1172, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974); Bradley v. School Board of City of Richmond, Va., 472 F.2d 318 (4 Cir. 1972), cert. granted 412 U.S. 937, 93 S.Ct. 2773, 37 L.Ed.2d 396 (1973); Thompson v. School Board of the City of Newport News, Va., 363 F.Supp. 458 (E.D.Va.1973).

The filing of this suit and its prosecution after that statute became effective no doubt accelerated the elimination of racially identifiable faculties, and will cause a modification of the assignments in a few schools.

■ Plaintiffs' attorneys have obtained relief for Mrs. Pinkney, and a declaratory judgment with respect to racially identifiable faculties. They have failed to obtain relief for the other plaintiffs. They failed to prove a pattern or practice of discrimination. They presented a mass of evidence, much of it obtained from and prepared by defendants as a result of pretrial discovery. A considerable amount of the evidence offered by plaintiffs was of little weight; but the presentation of such evidence required defendants to answer it, and placed large burdens of time and expense on defendants, which will have to be borne by the citizens of Charles County, black and white, in the shape of higher taxes or less services, or both. These factors, along with the guidelines set out in the recent case of Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5 Cir. 1974), and in many cases in the Fourth Circuit and other courts will be taken into account in fixing the fees to be allowed to plaintiffs' attorneys.

■ Mr. Lichtman spent 910 hours on the case, of which about 80 were spent in court; the senior members of his firm (Rauh and Silard) spent 115 hours, none in court. Mr. Gray spent 146 hours (70 in court). He is a member of the staff of the New York office of the NAACP Legal Defense Fund.

This is one of the first cases in which he has participated; he took little part in the trial, but that little was well done. Much of the attorneys' time was spent in preparing and presenting claims and points on which they did not prevail. A small proportion of the hours spent in preparation of the complaint and of the claims were spent before the 1972 statute became effective.

The questions were not novel.

No special skill was necessary to present the case; plaintiffs' attorneys did what could be done for their clients.

There has been no showing that other employment of plaintiffs' attorneys was precluded.

The "customary fee" in such cases depends upon many factors, including the extent to which the efforts succeeded. An allowance of $20 per hour, based upon the minimum hourly rate in the Criminal Justice Act, 18 U.S.C.A. 3006A(d)(1), is often considered a minimum allowance; but in such a case as this an hourly rate applied to all the hours spent would not be proper, because so much of the time was spent on claims which were not established, and defendants were required to spend such a large amount of time and effort in answering claims which were clearly without merit.

The amount of the fee which plaintiffs' attorneys could expect was contingent upon their success. The court is advised that counsel were assured of their expenses and of a minimal fee. A substantial fee was contingent upon their success in obtaining the relief requested on the several claims presented and an award by the court or payment by the successful plaintiffs.

No time limitations imposed by the client or the circumstances required priority work.

The amount involved and the results obtained, set out in the opinion, have been considered.

The experience, reputation and ability of the attorneys for both sides have been considered.

Although such a case as this may be "undesirable" business in some communities or circumstances, that would not be true in this case.

The court has considered the awards made in many other cases, but the limited success obtained here distinguishes this case from most of the cases cited or found.

The court concludes that a fee of $12,000 to counsel for plaintiffs should be allowed and included in the judgment.